UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| MINDY KAHLE, | ) | CIV.  04-5024-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER GRANTING IN PART AND |
| JERMAINE LEONARD, | ) | DENYING IN PART |
| individually and in his official | ) | DEFENDANTS' MOTIONS FOR |
| capacity; | ) | SUMMARY JUDGMENT, TO |
| DEPUTY TIM MALONE, | ) | DISMISS, AND FOR PARTIAL |
| individually and in his | ) | JUDGMENT ON THE PLEADINGS |
| individual capacity; | ) | |
| SHERIFF DON HOLLOWAY, | ) | |
| individually and in his official | ) | |
| capacity; | ) | |
| PENNINGTON COUNTY | ) | |
| SHERIFF'S OFFICE; and | ) | |
| PENNINGTON COUNTY JAIL, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Mindy Kahle, filed a complaint against Jermaine Leonard,

Deputy Tim Malone, Sheriff Don Holloway, Pennington County Jail

Supervisor Scott Schuft, the Pennington County Sheriff's Department

(PCSD), and the Pennington County Jail (Jail).  The complaint alleges

multiple causes of action against defendants, including claims under 42

U.S.C. § 1983 and pendent state law claims.  Defendants have moved for

summary judgment, and Leonard has moved to dismiss and for partial

judgment on the pleadings.  Kahle opposes the motions.

**BACKGROUND**

The evidence, viewed in the light most favorable to the nonmoving party, Kahle, is:

Kahle was arrested on September 11, 2002.  On December 14, 2002, she was incarcerated at the Jail.  (DSUMF ¶¶ 1-2).

On August 8, 2002, Leonard applied for employment as a corrections officer (CO) with the Jail.  Pennington County followed its system of hiring, which included a background check by a contract provider, a criminal history check, a credit history check, a psychological evaluation by a licensed psychologist, and interviews by the Pennington County Sheriff's Office (DSUMF ¶ 7).  The background check revealed Leonard had been a CO in Texas.  (Id. ¶ 9).  Three members of the senior jail staff conducted Leonard's initial interview, the purpose of which was to screen applicants for their ability to "problem solve."  (Id. ¶ 11).

Leonard was hired as a CO and began an eight-week training program on November 6, 2002.  (Id. ¶ 24; PSMF ¶ 5).  Leonard's planned training included two weeks in the classroom and six weeks of supervised, hands-on training on the cellblock. (Id. ¶ 25).  In the classroom, Leonard received instruction on ethics, con-games, cellblock observation, staff/inmate

2

communications, and cross-gender supervision.  (DSUMF ¶ 26).[1]  During

Leonard's training, a discussion took place regarding a prior incident of

sexual misconduct at the Jail.  Leonard participated in the discussion, and

afterward, his training officer, Sergeant Trent Fliginger, believed Leonard

clearly understood that the prior incident of sexual misconduct at the Jail

was a violation of jail policy and state law, and there were legal

consequences for such action.  (Docket 52 ¶ 7S).  There were no complaints

or other indications during Leonard's training that showed he posed a risk to

inmates or would require additional or different supervision.  (DSUMF ¶ 46).[2]

Neither Holloway, the Pennington County Sheriff who is responsible for the

Jail (Docket 81–Holloway Dep., Vol I, at 4:11-5:11), nor Schuft, the

---

[1]In her objections to the County Defendants' Statement of Undisputed
Material Facts, Kahle denies that Leonard was trained on cross-gender
supervision, arguing that Leonard only stated he watched videos entitled
"Con-Game, Hostage Incidents, Perimeter Cont. Room Sec./Contraband
Control, and Emergency Procedures (fire safety)."  (Docket 77 ¶ 26).  However,
in their statement of facts, the County Defendants state only that Leonard
was *trained* in "cross-gender supervision" (DSUMF ¶ 26).  Indeed, Leonard's
training schedule shows he was trained on "Cross Gender Supervision" on
November 12, 2002 (Docket 49 at 181), and Kahle presents no evidence to
rebut this fact.  To the extent these defendants claim Leonard watched a
video on "cross-gender supervision," the court must view the evidence in the
light most favorable to Kahle and assume Leonard did not watch the video.

[2]Kahle denies this statement by asserting "Leonard lied on his
application when he represented that he graduated from Angelina College
Police Academy."  Docket 77 ¶ 46.

3

Pennington County Jail Commander, were personally involved in Leonard's training.  (DSUMF ¶ 29; Docket 51 ¶ 1).[3]

On December 14, 2002, Fliginger, Leonard's field training officer (FTO), was not on duty.  (Id. ¶ 38).  Malone, a senior CO with three years' experience working on all cellblocks, including booking and the maximum security cellblocks, was selected to supervise Leonard.  (Id. ¶¶ 38, 47-48).  Fliginger asked Malone to fill in as an FTO, and Malone agreed.  (Id. ¶ 49).  Malone was reacquainted with the Daily Observation Reports (DOR) form and the FTO program.  Malone was encouraged to ask questions of Fliginger or other FTOs.  (Id.).

Between 10 and 11 p.m. on December 14, 2002, Leonard entered Kahle's cell three times.  (DSUMF ¶ 79).  The first time he entered, he kissed her and tried to pull down her pants.  (Id.).  The second time, he kissed her and kept trying to pull down her pants, then performed oral sex on her.  (Id.).  The third time, he kissed her and rubbed his private area on her private area.  (Id.).  Leonard informed Malone every time Leonard went into Kahle's cell.  (Docket 81–Leonard Dep. at 175:24-176:2).

───────────────

[3]Kahle denies this statement, citing the Holloway and Schuft depositions, which show Holloway is the sheriff and is in charge of the Jail, and Schuft is the jail administrator in charge of setting up training for recruits.  These facts do not rebut the statement that the two were not involved directly in Leonard's training.

4

While Leonard was in the cell, Malone was sitting at the work station in cell block 5 filling out an evaluation report on Leonard.  (PSMF ¶ 25).  The work station has a panel of lights to indicate whether cell doors are locked or unlocked.  (Id.; Docket 81–Malone Dep. at 63:21-64:1; Docket 84 ¶ 25).  The panel light for Kahle's cell would have switched from green (locked) to red (unlocked) at least twice as Leonard entered and left Kahle's cell.  (Docket 81–Malone Dep. at 65:9-23).  Malone did not notice the lights changing and did not observe what occurred on the upper level of the cell block, where Kahle's cell was located.  (Docket 81–Malone Dep. at 60:10-13, 65:24-66:2; PSMF ¶ 8).  Kahle testified in her deposition that she saw Malone look up when Leonard was at Kahle's cell.  (Docket 81–Kahle Dep. at 37:13-16, 121:8-13).

After an accusation was made against Leonard, the matter was referred to the PCSD for investigation.  (Id. ¶ 71).  Kahle also filed several inmate requests regarding the incident.  (Docket 81, Ex. 9).  The investigation revealed information to substantiate the accusations, and Leonard's employment was terminated.  (Id. ¶¶ 67, 71).  Leonard later pleaded guilty to criminal charges of sexual contact and served a sentence in jail.  (Docket 81–Leonard Dep. at 64:7-65:5, 169:5-8).

The Pennington County Jail Inmate Handbook contains the Jail's mission statement, which states, "The operating philosophy of the

5

Pennington County Jail provides for community safety, facility safety, and the welfare of staff and inmates in the most efficient manner possible." This mission statement is meant to provide safety for inmates and protect them from improper actions by guards. The handbook directs guards to protect inmates against physical, emotional, and psychological abuse or harassment. The protection would include situations in which a guard was having inappropriate contact with an inmate. (DSUMF ¶ 64). Policy 340.06 of the Pennington County Jail Policies and Procedures Manual, a copy of which each new Jail employee receives (Id. ¶ 44; Docket 49-5 at 166:14-167:20), states that Jail staff will follow procedures "to ensure that inmates are protected from personal abuse, corporal punishment, personal injury, disease, property damage or harassment." (Id. ¶ 68; Docket 49-4 at 4). Leonard knew he was not supposed to open Kahle's cell door after lockdown, go into Kahle's cell, or engage in sexual contact with her. (PSMF ¶¶ 38, 47). Leonard's contact with Kahle was in direct violation of the Pennington County Jail Policies. (Id. ¶ 69).

Before the incident involving Leonard and Kahle, in October 2002, inmates Brenda Kinstad and Teresa Crawford claimed CO Jerome Morris was making sexual remarks to female inmates and peering into Kahle's cell. (Id. ¶ 90). Schuft recommended counseling for the officer. (Id.). In 1999, CO Donovan sexually assaulted a female inmate. (Id. ¶ 91). Donovan was

6

terminated, and he was criminally charged for the assault.  (DSUMF ¶ 43

Docket 84 ¶ 94).  In August 1999, CO Monique Newcomb questioned inmate

Jovan Two Dogs about her sexual orientation and stated she found Two

Dogs attractive and wanted to meet her outside the jail.  (PSMF ¶ 92).

Newcomb was terminated as a result.  (Docket 81, Ex. 22 at 2).  In October

1995, inmate Clarissa Parks claimed CO Merle Thompson would stop to

watch her while she used the toilet.  (Docket 81, Ex. 23 at 2).  The supervisor

felt the complaint was unwarranted, but that the complaint should be

addressed and kept on the record due to conflicting statements about the

incident.  (Id.).

        Kahle filed this lawsuit, alleging violations of her constitutional rights,

assault and battery, negligence, and intentional infliction of emotional

distress.  (Docket 63–amended complaint).  Defendants Malone, Holloway,

Schuft, the PCSD, and the Jail (the County Defendants) have moved for

summary judgment.  Defendant Leonard also has moved for summary

judgment, to dismiss pendent state law claims, and for partial judgment on

the pleadings.

                      **SUMMARY JUDGMENT STANDARD**

        Summary judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the

7

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law.  Id.; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, the court views the evidence presented based upon which party has the burden of proof under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## DISCUSSION

### I.   Failure to Exhaust Administrative Remedies

Defendants argue Kahle's claims should be dismissed due to her failure to exhaust administrative remedies as required under the Prison Litigation Reform Act of 1995 (PLRA), 42 U.S.C. § 1997e(a).  "[T]he PLRA exhaustion requirement is an affirmative defense under Fed. R. Civ. P. 8(c)."  Foulk v.

8

<u>Charrier</u>, 262 F.3d 687, 697 (8th Cir. 2001).  "It is the burden of the defendant asserting this affirmative defense to plead and prove it."  <u>Id.</u>  The Jail provides procedures for redress of prisoner grievances related to their confinement.  Kahle did not file a grievance with the Jail before filing the instant lawsuit.  But Kahle did file four inmate requests to which, she contends, the PCSD did not respond.  Kahle argues that this failure to respond eliminated the availability of further administrative proceedings.  Viewed in the light most favorable to Kahle, the record is not clear as to whether she exhausted her administrative remedies.  Based on the current state of the record, the court concludes defendants have not met their burden of proving Kahle failed to exhaust her administrative remedies and denies defendants' motions based on failure to exhaust.

## II.    Pennington County Sheriff's Department and the Jail

PCSD and the Jail argue they are not entities that may be sued.  The capacity to be sued is determined by the law of the state in which the district court is located.  Fed. R. Civ. P. 17(b).  Under South Dakota law, jails are established by authority of the board of county commissioners and are operated at county expense.  <u>See</u> SDCL 24-11-2.  A county sheriff has charge of the jail in his county.  <u>See</u> SDCL 24-11-13.  "[C]ounty  jails are not legal entities amenable to suit."  <u>Owens v. Scott County Jail</u>, 328 F.3d 1026, 1026 (8th Cir. 2003).  A sheriff's department "is not a legal entity and, therefore, is

not subject to suit or liability under section 1983." Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir. 1992).[4]   The court concludes the PCSD and Jail are not proper party defendants because they are not legal entities that may be sued, and the claims against them must be dismissed.[5]

## III.   Official Capacity Claims

Holloway, Schuft, and Malone argue they are entitled to summary judgment on Kahle's claims against them in their official capacities.  Kahle's complaint names the individual defendants in both their individual and official capacities.  "Suits against public employees in their official capacity are the legal equivalent of suits against the governmental entity itself." Bankhead v. Knickrehm, 360 F.3d 839, 844 (8th Cir. 2004).  Accordingly, the court will treat the claims against the individual defendants in their official capacities as claims against Pennington County.

"A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an 'action pursuant to

---

[4]The Eighth Circuit has cited Dean with approval in at least two unpublished opinions that do not carry precedential value.  Wade v. Tompkins, 73 Fed. Appx. 890, 893, 2003 WL 22053145 (8th Cir. Aug 04, 2003) (unpublished per curiam); De La Garza v. Kandiyohi County Jail, 18 Fed. Appx. 436, 437, 2001 WL 987542 (8th Cir. Aug 30, 2001) (unpublished per curiam).

[5]The court further notes that the conclusion that PCSD and the Jail may not be sued matters little, for the claims against the individual defendants in their official capacities are the legal equivalents of claims against Pennington County, as explained below.

10

official municipal policy' or misconduct so pervasive among

non-policymaking employees of the municipality 'as to constitute a "custom

or usage" with the force of law.'" Ware v. Jackson County, Mo., 150 F.3d

873, 880 (8th Cir. 1998) (quoting Monell v. Dep't of Soc. Servs., 436 U.S.

658, 691 (1978) (internal quotations omitted)).  "Official policy involves 'a

deliberate choice to follow a course of action . . . made from among various

alternatives' by an official who has the final authority to establish

governmental policy."  Jane Doe A v. Special Sch. Dist. of St. Louis County,

901 F.2d 642, 645 (8th Cir. 1990) (quoting Pembaur v. City of Cincinnati,

475 U.S. 469, 483, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)).  Alternatively,

"custom or usage" is shown by:

> (1)   The existence of a continuing, widespread, persistent pattern
> of unconstitutional misconduct by the governmental entity's
> employees;
> (2)   Deliberate indifference to or tacit authorization of such
> conduct by the governmental entity's policymaking officials
> after notice to the officials of that misconduct; and
> (3)   Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental
> entity's custom, i.e., [proof] that the custom was the moving force
> behind the constitutional violation.

Id. at 646  "[A] municipality cannot be held liable *solely* because it employs a

tortfeasor—or in other words, a municipality cannot be held liable under

§ 1983 on a *respondeat superior* theory."  Monell, 436 U.S. at 691.

Kahle has not claimed her constitutional rights were violated due to an

official Pennington County policy.  Further, Kahle's memorandum opposing

11

summary judgment addresses the above-listed elements of a "custom or usage" claim.  Thus, the court must determine whether Kahle has presented evidence from which a jury could find the existence of a "custom or usage."

As noted above, proving "custom or usage" requires three elements be met.  First, Kahle must present evidence of the "existence of a continuing, widespread, persistent pattern of unconstitutional misconduct" by Pennington County employees.  Although Kahle cites Holloway's deposition, wherein he confirmed his concern that problems were occurring too much at the Jail (Holloway Dep. 51:22-24), this statement is insufficient to show a widespread pattern of unconstitutional misconduct.  Kahle also cites evidence "detailing the multitude of incidents where Jail staff was engaging in sexual misconduct with inmates to conclude a persistent pattern exists." (Kahle Br. at 14).  As County Defendants point out, however, four of those incidents occurred after the events forming the basis of Kahle's complaint in this matter.  This evidence cannot be used to demonstrate a pattern of unconstitutional conduct; the custom or usage at issue here relates only to things Pennington County could have remedied before Kahle's sexual assault.

As to events occurring before the sexual assault in this case, Kahle presents the following evidence: (1) two inmates complained that a CO made sexual remarks to them and looked into Kahle's cell; (2) in 1999, a CO

12

sexually assaulted a female inmate; (3) in 1999, a female CO questioned a female inmate about her sexual orientation and asked to meet the inmate outside the jail; and (4) in 1995, an inmate complained about a CO who would watch her use the toilet.  On the first, third, and fourth occasions, the incidents were investigated and corrective action was taken.  The CO in the first incident received counseling.  The CO in the third incident was fired.  The CO involved in the fourth incident was not fired because the allegations were found to be unwarranted.  The second incident is the only prior incident of sexual assault of an inmate.  In that incident, the offending CO's employment was terminated, and the CO was prosecuted for the offense.  "Liability for an unconstitutional custom or usage, however, cannot arise from a single act."  McGautha v. Jackson County, Mo., 36 F.3d 53, 57 (8th Cir. 1994).  Also, Leonard never had been involved in a sexual assault of an inmate, so County Defendants had no notice he would commit such an act.

In Andrews v. Fowler, 98 F.3d 1069, 1075-76 (8th Cir. 1996), the Eighth Circuit affirmed the district court's ruling that the plaintiff had failed to demonstrate the defendant city had a policy or custom of failing to investigate or act on complaints of sexual abuse by police officers.  The court ruled that "two specific prior complaints against [an officer] and the various rumors that do not implicate a particular officer pale in comparison to the type of prior complaints that we have previously held supported a verdict

13

against a city." Id. at 1076.  In Andrews, before the incidents surrounding that case, three officers with the North Sioux City Police Department previously were asked to resign based on "their relations with minor females in the community." Id. at 1075.  In each of those prior instances, however, the mayor and city council had taken immediate action in asking for resignations upon learning about the officer's misconduct. Id.  The Eighth Circuit ruled that, contrary to the plaintiff's arguments, these instances were strong evidence showing "the city had a policy or custom of taking adequate remedial action to remove police officers accused of sexual misconduct with minors." Id.  The court also concluded that the city similarly had acted to request the officer's resignation upon learning of the officer's misconduct. Id.  The "two instances of misconduct indicate that [the police chief] was aware that some problem existed with [the officer], but they do not indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct." Id. at 1076 (quoting Monell, 436 U.S. at 694).

The evidence in the present case is less than that presented in Andrews.  In this case, the evidence shows only four relevant incidents of misconduct occurred before Kahle's sexual assault.  In all four cases, an investigation was conducted.  In two of the cases, a CO was terminated. Only one of those incidents involved a sexual assault of an inmate.  In sum,

14

no evidence has been presented to show a persistent and widespread pattern of misconduct amounting to a county custom or policy of overlooking misconduct by COs.

Even assuming Kahle were able to establish a widespread, persistent pattern of unconstitutional misconduct, her claim would fail because she has not presented evidence to meet the second element necessary to prove her claim against Pennington County—a deliberate indifference to or tacit authorization of this conduct by Pennington County officials after receiving notice of the misconduct.  See Jane Doe A, 901 F.2d at 646.  Leonard's employment was terminated after the sexual assault that occurred in this case.  The evidence shows county officials investigated allegations of sexual misconduct at the jail.  Pennington County had in place policies to prevent sexual assaults and other sexual misconduct from occurring.  Kahle has not presented evidence to show Pennington County was deliberately indifferent to or tacitly authorized the misconduct that occurred in this case. Furthermore, because Kahle is unable to meet the first two elements of her claim, she also is unable to show Pennington County's custom was the moving force behind her assault by Leonard, the third element of her claim. Accordingly, summary judgment is granted in favor of Pennington County on Kahle's official capacity claims.

## IV.   Individual Capacity Claims

Holloway, Schuft, and Malone also seek summary judgment on Kahle's claims against them in their individual capacities.  Due to the similarity of the arguments regarding Holloway and Schuft, the court will address them simultaneously, and it will address Malone's arguments separately.

### A.   Holloway and Schuft

Holloway and Schuft argue they are entitled to summary judgment on Kahle's claims against them based on their hiring of Leonard, Leonard's training, or their supervision of Leonard.  Supervisors may not be held liable for Eighth Amendment claims brought under § 1983 strictly on a respondeat superior theory.  Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir. 1993).  Under Eighth Circuit precedent, Holloway and Schuft may be individually liable under § 1983 as supervisors for "failing to adequately receive, investigate, or act upon complaints of sexual misconduct by [jail] employees."  Andrews, 98 F.3d at 1078.  To hold supervisors liable, a plaintiff must show they:

(1)  Received notice of a pattern of unconstitutional acts committed by subordinates;
(2)  Demonstrated deliberate indifference to or tacit authorization of the offensive acts;
(3)  Failed to take sufficient remedial action; and
(4)  That such failure proximately caused injury to the [plaintiff].

Jane Doe A, 901 F.2d at 645.  Also, supervisors may be held individually liable if they "directly participate[] in the constitutional violation," or if their

16

"failure to train or supervise the offending actor caused the deprivation."
Tilson v. Forrest City Police Dep't, 28 F.3d 802, 806 (8th Cir. 1994). "The
standard of liability for a failure to train . . . is deliberate indifference." Id. at
807. "The standard of liability for failure to supervise is 'demonstrated
deliberate indifference or tacit authorization of the offensive acts.'" Id.
(quoting Bolin v. Black, 875 F.2d 1343, 1347 (8th Cir. 1989)). "This requires
a showing that the supervisor had notice that the training procedures and
supervision were inadequate and likely to result in a constitutional
violation." Andrews, 98 F.3d at 1078.

In order to hold Holloway and Schuft liable for their failure to
adequately receive, investigate, or act on complaints of sexual misconduct,
Kahle must first present evidence that Holloway and Schuft received notice
of a pattern of unconstitutional acts committed by subordinates. As noted
above with regard to Pennington County, the evidence presented does not
demonstrate a persistent and widespread pattern of misconduct, which is
necessary to hold Pennington County liable for a municipal policy or custom.
The court must separately address, however, whether the evidence is
sufficient to show that Holloway and Schuft individually were aware of such
a pattern. See id. Unlike the situation in Andrews, where Price was aware of
prior complaints against Fowler, in this case, Holloway and Schuft had not
received complaints regarding Leonard. Nor were they on notice of a pattern

17

based on other incidents at the Jail.  Only one other sexual assault had occurred at the Jail before the incident involving Kahle, and that incident was fully investigated, resulting in the termination and prosecution of the CO.  Kahle has failed to present evidence that Holloway and Schuft had notice of a pattern of unconstitutional acts committed by subordinates.

Even assuming Holloway and Schuft were on notice of such a pattern, Kahle has not presented evidence that they were deliberately indifferent to or tacitly authorized the conduct.  Although the Policy Manual did not inform officers it was a felony to have sexual contact with inmates, and although the Jail did not have video cameras in it, these facts, taken in the light most favorable to Kahle, do not demonstrate deliberate indifference or tacit authorization.  All applicants for CO positions were subjected to a thorough background investigation, and the report of the investigation performed on Leonard did not disclose information that would have alerted Holloway and Schuft to the potential that Leonard would conduct himself as he did. Leonard did not have a criminal history that would have disqualified him from employment as a CO.  A psychological examination did not reveal anything that would disqualify Leonard.  After the incident at issue, Leonard was terminated from employment and prosecuted, as was Donovan, the offender in the other sexual assault at the Jail.  Kahle has not presented

18

evidence sufficient to demonstrate Holloway and Schuft were deliberately indifferent to or tacitly authorized Leonard's assault of Kahle.

Further, assuming Kahle had presented evidence of deliberate indifference or tacit authorization, she has not shown that Holloway and Schuft failed to take remedial action. After the prior incidents of sexual misconduct, investigations were conducted and punishments handed down, including termination of two offending employees and counseling for another. Leonard similarly was terminated. Kahle has not presented sufficient evidence to show Holloway and Schuft failed to take sufficient remedial action.

Alternatively, supervisors also may be held individually liable if their "failure to train or supervise the offending actor caused the deprivation." Tilson, 28 F.3d at 806. The standard of liability for a failure to train is deliberate indifference, while the standard for failure to supervise is deliberate indifference or tacit authorization of the offensive acts. Id. "This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." Andrews, 98 F.3d at 1078. As discussed above, Holloway and Schuft were not deliberately indifferent to and did not tacitly authorize sexual assaults at the Jail. Further, nothing in the record shows these two defendants had notice of inadequate training procedures and

19

supervision that were likely to result in a constitutional violation.  Thus, Holloway and Schuft are entitled to summary judgment on Kahle's claims against them in their individual capacities.  Additionally, because these defendants are entitled to summary judgment in both their official and individual capacities, the issue of whether they are protected by qualified immunity is moot.

### B.   Malone

Malone argues he is entitled to summary judgment on Kahle's claims against him in his individual capacity for several reasons.  First, Malone argues he was not involved personally in any conduct that allegedly violated Kahle's constitutional rights.  Second, under Kahle's failure to supervise theory, Malone contends he was not deliberately indifferent.  Third, Malone asserts he is entitled to qualified immunity because Kahle's allegations do not state a constitutional violation and the law in existence on December 14, 2002, did not give Malone fair notice that his conduct would violate Kahle's constitutional rights.

### 1.   Qualified Immunity

The court will address Malone's qualified immunity argument first. "Qualified immunity shields government officials from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." Liebe v. Norton, 157 F.3d

20

574, 577 (8th Cir. 1998) (citation omitted).  "To withstand the application of qualified immunity, a plaintiff must assert a violation of a constitutional or statutory right; that right must have been clearly established at the time of the violation; and, given the facts most favorable to the plaintiff, there must be no genuine issues of material fact as to whether a reasonable official would have known that the alleged action indeed violated that right."  Id.

It is "well-established" that "failing to protect inmates from a foreseeable attack violates the Eighth Amendment when an official is 'deliberately indifferent to a substantial risk of serious harm.'"  Lawrence v. Bowersox, 297 F.3d 727, 732 (8th Cir. 2002) (quoting Estate of Davis by Ostenfeld v. Delo, 115 F.3d 1388, 1395 (8th Cir. 1997)).  Also, "[a]n inmate has a constitutional right to be held in a safe prison cell."  Wayland v. City of Springdale, Ark., 933 F.2d 668, 671 (8th Cir. 1991).  Finally, a reasonable official would have known that failing to protect an inmate from sexual assault would violate those rights.  This Eighth Amendment right was clearly established prior to December 14, 2002.  Thus, Malone is not entitled to qualified immunity.

### 2.   Failure to Supervise

Supervisors may be held individually liable if their "failure to train or supervise the offending actor caused the deprivation."  Tilson, 28 F.3d at 806.  "The standard of liability for failure to supervise is 'demonstrated

21

deliberate indifference or tacit authorization of the offensive acts.'" Id. at 807 (quoting Bolin, 875 F.2d at 1347).  "This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." Andrews, 98 F.3d at 1078.

A question of fact exists as to whether Malone, as Leonard's supervisor, demonstrated deliberate indifference to the sexual assault.  On the night in question, Malone was responsible for supervising Leonard, who was still a trainee.  (PSMF ¶ 6).  Malone was on the cell block to observe Leonard and ensure that he did not do anything inappropriate.  (Id. ¶ 9).  Malone was also in charge of making sure that lockdown was performed correctly.  (Id. ¶14).  Pursuant to Jail policy, the supervisor was required to record in the shift log each time an inmate's door is opened after lockdown.  (Policy Manual 300.04.  It is undisputed that Leonard went into Kahle's cell three times that night, but the shift log does not reflect that her cell doors were opened after lockdown.  (PSMF ¶ 23).  When the cell doors are opened, the panel lights change color from green to red.  The panel lights were located on the work station where Malone was seated.  Malone testified he did not notice the panel lights changing.  Leonard testified he told Malone every time he went up to Kahle's cell.  (PMSF ¶ 18).  Malone claims he did not observe what occurred on the upper level of the cell block, where Kahle's cell was

located, but Kahle testified in her deposition that she saw Malone look up when Leonard was at Kahle's cell. (Docket 81–Kahle Dep. at 37:13-16, 121:8-13). After considering the evidence in the light most favorable to Kahle, the court concludes a genuine issue of material fact remains as to whether Malone was deliberately indifferent to the sexual assault committed on Kahle. Thus, Malone's motion for summary judgment is denied.

**V.     State Law Claims**

County Defendants move for summary judgment on Kahle's negligence claim, contained in the Third Count, based on statutory immunity. Leonard moves for partial judgment on the pleadings on this claim. As to the County Defendants, Kahle concedes "that Defendants are statutorily immune from this claim," and she "withdraws the Third Count of her Complaint alleging Defendants Holloway and Schuft were negligent." Kahle's concession is somewhat ambiguous, however, and her brief appears only to expressly address the arguments by Holloway and Schuft. To the extent Kahle's brief does not address Malone, the court concludes that Malone is entitled to summary judgment on the negligence claim. See Webb v. Lawrence County, 144 F.3d 1131, 1139-40 (8th Cir. 1998); SDCL 3-21-8, -9.

Kahle does not object to Leonard's motion for partial summary judgment, conceding that the negligence claims for "failure to adequately supervise, monitor, and train" Jail employees "do not pertain to Defendant

23

Leonard." Thus, all defendants are granted summary judgment on the Third Count of the amended complaint.

## VI.   Jermaine Leonard

### A.   Motion for Summary Judgment

Leonard argues he is entitled to summary judgment on the First and Fourth Counts of the amended complaint because Kahle did not suffer a physical injury, which is required before a prisoner may bring a federal claim for emotional or mental injury. Leonard contends that nowhere in her amended complaint does Kahle allege a physical injury or even allege treatment for physical injuries.

Under the PLRA, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). In enacting § 1997e(e), the Eighth Circuit has noted, Congress used "unmistakably clear language," evincing its intent to "limit[] recovery for mental or emotional injury in all federal actions brought by prisoners." Royal v. Kautzky, 375 F.3d 720, 723 (8th Cir. 2004).

Section 1997e(e) does not define "physical injury," however, and the Eighth Circuit has not published an opinion on what constitutes "physical injury." The Second Circuit, however, has addressed the issue. In Liner v. Goord, 196 F.3d 132, 135 (2d Cir. 1999), the court reversed the district

24

court's dismissal under section 1997e(e), holding the plaintiff's "alleged sexual assaults qualif[ied] as physical injuries as a matter of common sense." The court also observed that "sexual assaults would constitute more than *de minimis* injury." Id. (citing Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997) (holding that the physical injury necessary to support a claim for mental or emotional suffering "must be more than *de minimus* [sic], but need not be significant")). In an unpublished opinion, the Eighth Circuit reached a similar conclusion in Williams v. Prudden, 67 Fed. Appx. 976, 978, 2003 WL 21135681 (8th Cir. May 19, 2003) (unpublished). Citing Liner, the court held that the plaintiff had "sufficiently state[d] an Eighth Amendment claim," including resulting emotional and bodily harm, "by alleging that [a CO] forcibly ground his pelvis against her, grabbed her breast, verbally demanded sexual favors, made physical sexual advances, and attempted to force himself upon her." Id.

The court notes that both Liner and Williams appear to have involved at least some other demonstrable physical injury. See Liner, 196 F.3d at 133 (stating COs had "slammed appellant's head into a cabinet, struck his face, and taunted him with racial slurs," although this conduct was unrelated to the plaintiff's emotional distress claim with respect to sexual assault); Williams, 67 Fed. Appx. at 977 (stating plaintiff "suffered resulting bodily and emotional harm"). But the Second Circuit's conclusion in Liner does not

25

reference the potential physical injury the plaintiff may have incurred in an incident unrelated to the emotional distress claim.  See Liner, 196 F.3d at 135.  Further, the Eighth Circuit's ruling in Williams cites the Liner court's holding that a sexual assault qualifies as a physical injury as a matter of common sense, without distinguishing that holding from the case before the court, in which bodily harm had occurred.  While mindful that the law on this issue is not clearly defined within the Eighth Circuit, the court finds persuasive the Second Circuit's opinion, as well as the Eighth Circuit's unpublished opinion.  Kahle has presented evidence to support her claim that she was sexually assaulted by Leonard.  This sexual assault included penile, digital, and oral touching, as well as penetration of, her vaginal area.  Thus, Kahle, by presenting evidence that she was sexually assaulted, has shown she suffered a physical injury.  Accordingly, Leonard's motion for summary judgment on this issue is denied.

### B.   Motion to Dismiss

Leonard next argues the pendent state law claims against him should be dismissed because "they are barred by the sovereign immunity afforded by SDCL 3-21-8 and 3-21-9(5)."[6]  Under SDCL 3-21-8, "[n]o person, political

---

[6]As Kahle points out in her brief opposing summary judgment, the immunity provided by these statutes commonly is referred to as "statutory immunity" rather than sovereign immunity.  To the extent Leonard moves for dismissal based on sovereign immunity, the motion must be denied because Pennington County waived such immunity by purchasing liability insurance

subdivision or the state is liable for failure to provide a prison, jail or penal or correctional facility, or if such facility is provided, for failure to provide sufficient equipment, personnel, programs, facilities or services in a prison or other correctional facility."  SDCL 3-21-9(5) provides in part that "[n]o person, political subdivision or the state is liable . . . for any injury caused by or resulting from . . . (5) services or programs administered by or on behalf of the prison, jail or correctional facility."

In <u>Webb</u>, the plaintiff sued Lawrence County and its sheriff for a sexual assault at the hands of the plaintiff's cellmate.  <u>Webb</u>, 144 F.3d at 1133-34. The Eighth Circuit held that the defendants were entitled to statutory immunity on the plaintiff's *negligence* claim, noting the plaintiff had not "claim[ed] that defendants acted intentionally, were not acting within the scope of their authority or performing county functions, or were performing merely ministerial acts."  <u>Id.</u> at 1139-41.

In reviewing a case under Arkansas law, the Eighth Circuit has observed that "[a] public official is subject to suit for the commission of an intentional tort, or for actions taken when the official is not performing a county function."  <u>Davis v. Fulton County, Ark.</u>, 90 F.3d 1346, 1353 (8th Cir. 1996) (internal citations omitted).  In analyzing a plaintiff's claims

_____

from the South Dakota Public Assurance Alliance.  <u>See</u> <u>Webb v. Lawrence County</u>, 144 F.3d 1131, 1139 (8th Cir. 1998); SDCL 21-32A-1, -2.

against a school district official, the South Dakota Supreme Court reviewed statutes that provided immunity to state officials acting within the scope of their employment, regardless of whether such acts are ministerial or discretionary. <u>Bego v. Gordon</u>, 407 N.W.2d 801, 808 (S.D. 1987) (citing SDCL 21-32-17; 21-32A-2). The court opined that "[a] school district official who commits an intentional tort or acts ultra vires exceeds the scope of his official authority and will not be shielded by immunity." <u>Id.</u> The court also noted that public employees usually have immunity from liability for injuries resulting from erroneous or mistaken decisions, provided the acts are done within the scope of the officer's authority. <u>Id.</u> at 808 n.10. Thus, the court concluded, the officer is not liable for an exercise of discretion, except in cases involving, among other things, intentional torts. <u>Id.</u>; <u>see also</u> <u>Swedlund v. Foster</u>, 657 N.W.2d 39, 46 (S.D. 2003) (citing <u>Bego</u> and <u>Webb</u>, and ruling that "[s]overeign immunity is not a defense to a claim under 42 U.S.C. § 1983 because civil rights violations claim an intentional tort.").

The claims in the Second and Fourth Counts of Kahle's amended complaint allege intentional torts committed by Leonard. The South Dakota Supreme Court has not addressed whether SDCL 3-21-8 and -9(5) provide immunity from claims based on intentional torts. The South Dakota Supreme Court's rulings in other similar contexts and Eighth Circuit case law persuades the court that no immunity is available to Leonard for

28

intentional tort claims.  Leonard's motion to dismiss is denied.  Based on the foregoing, it is hereby

ORDERED that the motion for summary judgment by defendants Pennington County Sheriff Don Holloway, Pennington County Jail Supervisor Scott Schuft, the Pennington County Sheriff's Department, and the Pennington County Jail (Docket 47) is granted.

IT IS FURTHER ORDERED that the motion for summary judgment by Deputy Tim Malone (Docket 47) is granted in part and denied in part.

IT IS FURTHER ORDERED that Leonard's motion for summary judgment (Docket 54) is denied.

IT IS FURTHER ORDERED that Leonard's motion to dismiss (Docket 57) is denied.

IT IS FURTHER ORDERED that Leonard's motion for partial judgment on the pleadings (Docket 59) is granted.

Dated May 26, 2006.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE